## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Terry Wagner (R07282),      )
                              )
          Plaintiff,     )
                              )     Case No. 20 C 50080
        v.            )
                              )     Hon. Iain D. Johnston
Wexford Health Sources, Inc., *et al.*,   )
                              )
         Defendants.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff's "motion to exclude inadmissible evidence in Defendants' summary judgment motion based on fraud and unsigned document" [183] is denied. Defendants' "motion for leave to file corrected declaration of Dr. Zahtz in support of summary judgment" [187] is granted. Plaintiff's "motion to amend" [189] is denied. Plaintiff's "motion for leave to file late motion" [195] is granted. Defendants' summary judgment motion [159] is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.

## BACKGROUND

Plaintiff Terry Wagner, an Illinois state prisoner confined at Dixon Correctional Center ("Dixon"), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 back in February 2020, alleging a violation of his constitutional rights under the Eighth Amendment. The allegations in this lawsuit arise out of Plaintiff's medical care and treatment related to his C-PAP machine. More specifically, Plaintiff alleges that Defendants failed to respond appropriately to his requests for a C-PAP humidifier and to be referred to an outside ear, nose, and throat ("ENT") specialist.

For several years, the parties engaged in protracted motion practice in this case. In May 2024, some *four years* after Plaintiff initiated the lawsuit, the case reached the dispositive motion phase, with Defendants Zahtz, Wexford, Ritz, and Garcia filing a summary judgment motion on May 31, 2024. The Court clarifies that the only claims that remain at summary judgment are Plaintiff's federal Eighth Amendment medical deliberate indifference claim (against Defendants Garcia and Ritz) and his state law negligence claim (against all Defendants). (*See* Dkt. 84, 04/21/22 Memorandum Opinion and Order granting in part and denying in part Defendants' motion to dismiss, finding that: "[t]he case will proceed against Drs. Garcia and Ritz. Wagner's *Monell* claim against Wexford is dismissed without prejudice . . . . Wagner's Eighth Amendment claim against Dr. Zahtz is dismissed without prejudice . . . . Furthermore, because Wagner's Eighth Amendment claim proceeds, the Court will exercise supplemental jurisdiction over his state law negligence claim, which proceeds against all Defendants.").

Plaintiff responded to Defendants' motion for summary judgment,[1] and Defendants replied. For the reasons discussed below, Defendants' summary judgment motion is granted.

---

[1] Plaintiff submitted a number of motions in connection with his response to Defendants' summary judgment motion. The first motion, filed on August 26, 2024, asserts that "Defendants are intentionally attempting to mislead this Court." (Dkt. 183 at pg. 2.) Plaintiff maintains that Defendants have made "false statements" against him in their summary judgment materials and submitted an "unsigned and unsworn" declaration from Dr. Zahtz. (*Id.* at pgs. 2-3.) Plaintiff's motion (Dkt. 183) is denied; the statements made in Defendants' summary judgment materials reflect the evidence in the record, and the "unsigned" Declaration from Dr. Zahtz appears to have been an oversight/technical error on the part of the Defendants. For this reason, the Court grants Defendants' "motion for leave to file a corrected declaration of Dr. Zahtz in support of summary judgment" (Dkt. 187). Plaintiff's second motion (Dkt. 189), filed on September 5, 2024, asks that the Court grant him leave to amend his summary judgment response "if [it] allows Defendant Zahtz to correct his declaration." Plaintiff's motion (Dkt. 189) is denied; the Court finds no reason to permit Plaintiff to amend his summary judgment response, which already comprehensively addresses Defendants' various arguments, including those related to Dr. Zahtz. Finally, Plaintiff has submitted a motion (Dkt. 195) that asks that the Court grant him leave to "file late motion to exceed the 15-page limitation for memorandum of law." Given that Plaintiff's 24-page "opposition" brief contains a number of pages that are mainly blank (*see* Dkt. 185 at pgs. 4, 7, 12, 23), the Court grants his motion (Dkt. 195).

I.      **Northern District of Illinois Local Rule 56.1**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court.  Rule 56.1 requires the party moving for summary judgment to provide a statement of material facts and a supporting memorandum of law. LR 56.1(a)(1), (2) (N.D. Ill.) (amd. Feb. 18, 2021). The statement of material facts "must consist of concise numbered paragraphs[,]" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(1),(2).   When addressing facts in its memorandum of law, the moving party "must cite directly to specific paragraphs in the LR 56.1 statements or responses." LR 56.1(g).

The party opposing summary judgment must submit a supporting memorandum of law and a response to the moving party's statement of facts. LR 56.1(b)(1), (2). A fact may be admitted, disputed, or admitted in part and disputed in part. LR 56.1(e)(2). To dispute an asserted fact, the opposing party "must cite specific evidentiary material that controverts the fact" and explain "how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate[.]" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3).

Here, Defendants filed a Rule 56.1 statement of material facts with their motion for summary judgment.  (Dkts. 159, 160.)  Consistent with the Local Rules, Defendants also provided Plaintiff with a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment.  (Dkt. 162.)

For his part, Plaintiff submitted a 28-page response to Defendants' statement of facts (Dkt. 184), which generally corresponds to Defendants' factual statements.  He also submitted a 24-page

3

"opposition" brief (Dkt. 185), which appends a voluminous set of exhibits. The Court notes that Plaintiff's response includes a statement of facts (*see* Dkt. 184 at pgs. 23-28), to which Defendants have responded (Dkt. 192).

Plaintiff's summary judgment materials are difficult to parse. That said, because Plaintiff is proceeding *pro se*, notwithstanding the deficiencies in his compliance with Rule 56.1,[2] the Court has interpreted his responses generously and will construe them as favorably as the record and Local Rule 56.1 permit, to the extent that he has pointed to admissible evidence in the record that corresponds to Defendants' facts or could properly testify himself about the matters asserted. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. With this standard in mind, the Court turns to the facts of this case.

## II.    Facts

This lawsuit concerns Plaintiff's medical care at Dixon. (*See* Dkt. 22, Pl.'s Third Am. Compl.) More specifically, Plaintiff alleges medical deliberate indifference in connection with his requests for a humidifier on his C-PAP machine and to be sent to an ENT specialist. (*See id.* at pgs. 3-5.) Plaintiff complains that Defendants failed to adequately address his request for a humidifier for his C-PAP machine. (*See id.*) He also complains that Defendants delayed sending

---

[2]    The Court will not set forth an exhaustive list here, but points out that Plaintiff's summary judgment submissions are deficient in numerous ways. Initially, his 28-page response (which contains citations to evidentiary materials) does not append any exhibits; rather, Plaintiff appends his evidentiary materials to his "opposition" brief. With respect to his responses to Defendants' factual statements, Plaintiff "objects" on relevancy grounds to some of them (*see e.g., id.* at pg. 3, ¶¶ 1, 11), admits some of them but also simultaneously provides commentary that seemingly disputes the fact (*see e.g., id.* at pg. 7, ¶¶ 12, 13, 15, 18, 26, 33), and provides no response at all to at least one of Defendants' facts (*see e.g., id.* at pg. 4, ¶ 5). Further, a number of Plaintiff's responses contain legal argument or are argumentative in nature (*see e.g., id.* at ¶¶ 35, 39). Additionally, the Court observes that some of Plaintiff's asserted disputes do not appear to concern the fact itself, but rather Defendants' particular phrasing or characterization of a statement. And, in a number of instances, Plaintiff's disputes are not supported by the cited evidence attached to his "opposition" brief. Plaintiff's statement of facts (*see* Dkt. 184 at pgs. 23-28) suffers from various deficiencies as well, and his "opposition" brief impermissibly attempts to assert facts in the body of the document.

him to an ENT specialist and that they denied sending him to an ENT of his choosing. (*See id.*)

Plaintiff is an individual in the custody of the Illinois Department of Corrections (IDOC) and has been housed at the Dixon Correctional Center since November 22, 2016. (Dkt. 160, Defendants' Statement of Facts (SOF), ¶ 1.)

Defendant Dr. Zahtz is a licensed physician who was employed by Wexford Health Sources, Inc. as its Medical Director at Dixon from December 4, 2017, through March 30, 2022. (*Id.* at ¶ 2.) At that point, he was then transferred to Sheridan Correctional Center. (*Id.*) As Medical Director for Dixon, his job duties included providing medical care and treatment to inmates at the prison and participating in collegial review regarding off-site medical care and treatment for inmates. (*Id.*) Dr. Zahtz has no role in scheduling off-site medical appointments for inmates. (*Id.*)

Defendant Dr. Garcia is a licensed physician who worked as Wexford Health Sources, Inc.'s National Medical Director from 2010, through March 2021. (*Id.*) Dr. Garcia's job duties included participating in the collegial review process, which included reviewing referral requests for off-site medical services submitted by on-site practitioners at various prisons throughout Illinois. (*Id.*) Dr. Garcia had no role in scheduling off-site medical appointments for inmates. (*Id.*)

Defendant Dr. Ritz is a licensed physician. (*Id.* at ¶ 4.) Beginning in May 2014, he was employed by Wexford Health Sources, Inc. as a Utilization Management Medical Director, and from September 2014, until July 5, 2020, was employed by Wexford as the Corporate Utilization Management Medical Director. (*Id.*) On July 5, 2020, Dr. Ritz became Wexford's Chief Medical Officer, while maintaining his duties in Utilization Management for the Illinois contract. (*Id.*) Dr. Ritz's job duties included participating in the collegial review process, which included reviewing

referral requests for off-site medical services submitted by on-site practitioners at various prisons throughout Illinois. (*Id.*) Dr. Ritz had no role in scheduling off-site medical appointments for inmates. (*Id.*)

Defendant Wexford Health Sources, Inc. is a private corporation that has contracted with IDOC to provide certain medical services to inmates at various prisons throughout Illinois, including Dixon. (*Id.* at ¶ 5.)

### *C-PAP Machines*

"C-PAP" stands for Constant Positive Airway Pressure. (*Id.* at ¶ 6.) A C-PAP machine may be given to a patient diagnosed with obstructive sleep apnea to improve breathing during sleep. (*Id.*) The C-PAP machine has a mask attached to it that is worn by the patient. (*Id.*) The air delivered through the mask to the patient is ambient air, meaning air that is as dry or humid as the environment the patient is sleeping in. (*Id.*)

Some C-PAP users may elect to attach a humidifier to the machine to humidify the air delivered through the mask. (*Id.* ¶ 7.) A C-PAP humidifier is not medically necessary for the machine to work or the patient to gain a benefit from the machine. (*Id.*) Rather, a C-PAP humidifier is a comfort measure intended to alleviate symptoms of dry mouth that may be caused by a C-PAP machine. (*Id.*)

Defendants introduce evidence showing that using a humidifier with a C-PAP is controversial in the medical community. (*Id.* at ¶ 8.) Using a humidifier with a C-PAP may cause complications with the machine's efficacy. (*Id.*) One such complication is moisture condensation in the tubing of the machine, which then delivers water to the wearer and may result in choking the user. (*Id.*) Humidifying the C-PAP may result in bacterial contamination, resulting in user infection. (*Id.*)

Defendants also introduce evidence showing that a C-PAP may present security concerns in a correctional environment. (*Id.* at ¶ 9.) Different correctional institutions may scrutinize requests for humidifiers, as inmates may use them to conceal and ingest illicit substances. (*Id.*) Also, a humidifier, which is made of plastic, can be broken up and used as a weapon. (*Id.*)

Even if a C-PAP humidifier may be indicated for a patient, a prison's administration may decide that the humidifier poses a security risk and may be prohibited. (*Id.* ¶ 10.) Plaintiff admitted during his deposition that he received a disciplinary ticket for "having unauthorized pills" in his possession. (*Id.* at ¶ 11.)

### *The Collegial Review Process*

Wexford's collegial review process involves a utilization management physician who reviews referral requests for off-site medical services submitted by on-site practitioners at various prisons throughout Illinois. (*Id.* at ¶ 12.) This process involves reviewing referral requests for off-site medical services and supporting documents and conferring with the prison's Medical Director about such referrals. (*Id.*)

During a collegial review, a utilization management physician would collaborate with the prison's Medical Director about the necessity of the requested off-site service, and whether alternative on-site treatment options had been properly utilized and exhausted first. (*Id.*) If a requested off-site service is not medically necessary, or there are other on-site treatment options that have yet to be tried, the utilization management physician will collaborate with the prison's Medical Director to form an appropriate alternate treatment plan. (*Id.*)

To the extent a referring provider believes a non-approval of a referral request was inappropriate, the provider can submit an appeal of that decision. (*Id.* at ¶ 13.) An appeal would trigger a further review of the referral request by a Wexford Utilization Management physician,

who would review the request and non-approval, along with any other relevant information submitted by the referring providers.  (*Id.*)  Further, a referral request may be revisited once an alternative treatment plain is completed, or the patient's condition changes.  (*Id.*)

### *Plaintiff's Medical Treatment*

Plaintiff began using a C-PAP machine sometime in 2013 following a sleep study, which concluded Plaintiff had obstructive sleep apnea[3] (OSA).  (*Id.* at ¶ 14.)

On or about March 15, 2017, Plaintiff saw Dr. Tim Chamberlain to discuss replacing the mask and tubing for his C-PAP machine.  (*Id.* at ¶ 15.)  At that time, Plaintiff asked Dr. Chamberlain if he could receive a humidifier for his C-PAP machine.  (*Id.*)  Plaintiff wanted to know if his family could send him a humidifier, and Dr. Chamberlain's notes show that he planned to inquire if that would be possible.  (*Id.*)

On or about November 11, 2017, Dr. Zahtz saw Plaintiff, who requested a humidifier for his C-PAP machine.  (*Id.* at ¶ 16.)  Dr. Zahtz's notes show that he planned to discuss Plaintiff's request with the prison administration.  (*Id.*)  Dr. Zahtz's notes also show he had reviewed Plaintiff's 2013 sleep study;  in the addendum, there is no mention of any need for a humidifier for Plaintiff's C-PAP machine.  (*Id.*;  *see also* Dkt. 160-2, Declaration of Dr. Zahtz at pg. 15, Addendum.)  Dr. Zahtz also noted that there may be a security risk to the prison with using a humidifier.  (SOF at ¶ 16.)

On or about January 28, 2018, Dr. William Rankin saw Plaintiff regarding his complaints of low back pain and for a follow-up about his C-PAP machine.  (*Id.* at ¶ 17.)  At this time, Dr. Rankin advised Plaintiff that humidifiers present a security risk and would not be allowed in the

---

[3]     Obstructive sleep apnea occurs when the throat muscles relax and block the airway.  *See* https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090 (last visited February 26, 2025.)

IDOC.  (*Id.*)

On February 19, 2018, Plaintiff returned to the nurse sick call and complained that he was having trouble sleeping while wearing his C-PAP machine.  (*Id.* at ¶ 18.)  The nurse advised Plaintiff that the reason he is waking up at night could be due to a number of other factors, including his environment, age, and discomfort from the C-PAP mask itself, and that it was not necessarily because of a lack of a humidifier.  (*Id.*)  The nurse's notes show that she planned to refer Plaintiff to see a physician about his complaints of waking up at night.  (*Id.*)

On February 21, 2018, Dr. Zahtz saw Plaintiff regarding his complaint of a dry throat and waking up during the night.  (*Id.* at ¶ 19.)  Plaintiff reported that when using his C-PAP machine at night, he alternated between using a nasal cannula and his C-PAP mask depending on his sleep position.  (*Id.*)  Dr. Zahtz assessed Plaintiff with obstructive sleep apnea (OSA) with a dry throat due to a lack of humidifier.  (*Id.*)  He also noted that he would consider referring Plaintiff to an ear, nose, and throat (ENT) specialist in the future if Plaintiff's issues persisted.  (*Id.*)  Dr. Zahtz's notes also show that he planned to see if he could obtain a humidifier for Plaintiff's C-PAP machine through the prison's central supply.  (*Id.*)

On March 12, 2018, Dr. Zahtz participated in a collegial review with Dr. Garcia regarding Plaintiff's request to obtain a humidifier for Plaintiff's C-PAP machine.  (*Id.* at ¶ 20; *see also* Dkt. 160-2 at pg. 20.)  Dr. Garcia denied the request at that time, and instead instructed Dr. Zahtz to continue to monitor Plaintiff's condition onsite at the prison.  (SOF at ¶ 20.)  Dr. Zahtz noted in Plaintiff's chart that the request for a C-PAP machine was denied as it posed "a major security issue in a prison facility."  (SOF at ¶ 20; *see also* Dkt. 160-2 at pg. 22, Alternative Care Recommended Notes.)

On or about March 20, 2018, Dr. Zahtz saw Plaintiff for a follow-up on his February 21,

2018, appointment. (*Id.* at ¶ 21.) Plaintiff reported waking up every two hours at night due to having a "dry throat, etc. and becoming intolerable." (SOF at ¶ 21; *see also* Dkt. 160-2 at pg. 23.) Dr. Zahtz noted that Plaintiff had OSA and was using a C-PAP machine without a humidifier. (SOF at ¶ 21.) Dr. Zahtz's notes show that Plaintiff stated that his C-PAP machine was "not working" and that he wanted an appointment with an ENT. (SOF at ¶ 21; *see also* Dkt. 160-2 at pg. 23.) Dr. Zahtz noted that if Plaintiff's C-PAP machine was not working, Plaintiff may respond to surgery. (*Id.* at ¶ 21.) Dr. Zahtz's notes show that he planned to submit a referral request to send Plaintiff for a consultation with an ENT. (*Id.*)

Subsequently, Dr. Zahtz participated in another collegial review with Dr. Garcia regarding the referral request for an ENT appointment.[4] (*Id.* at ¶ 22.) Dr. Garcia did not approve this request as he wanted more information before approving it. (*Id.*) Dr. Zahtz requested Plaintiff's most recent sleep study report, a physical exam of the muscle tone in Plaintiff's neck, his body mass index, and other information about his physical condition. (*Id.*) On or about April 2, 2018, Dr. Zahtz noted that his referral request had not been approved. (*Id.*)

On April 10, 2018, Dr. Zahtz saw Plaintiff to discuss the denial of his request to send Plaintiff for an ENT consultation. (*Id.* at ¶ 23.)

On September 14, 2018, Dr. Nancy Lank saw Plaintiff for a follow-up on x-rays and lab work. (*Id.* at ¶ 24.) At that time, Dr. Lank noted that Plaintiff was obese and had enlarged tonsils. (*Id.*) Plaintiff reported a dry throat and mouth while using his C-PAP machine and that he was waking up at night. (*Id.*) Dr. Lank's notes show that she planned to refer Plaintiff for an ENT

---

[4] Defendants assert that this collegial review occurred "[o]n or about April 2, 2018[.]" (SOF at ¶ 22.) However, it is unclear from the documentation in the record the exact date this collegial review occurred. In his response to Defendants' facts, Plaintiff, citing to his own declaration, purports to dispute this fact, stating that "Dr. Zahtz did not request for an ENT specialist for [him] on **April 12, 2018**. There is no documentation from Wexford around that time that indicates a collegial review occurred pertaining to [his] medical complaints." (Dkt. 184 at pg. 9, ¶ 22.)

consultation due to his large tonsils and sleep apnea. (*Id.*) That same day, Dr. Lank submitted a referral request for a non-urgent consultation with an ENT. (*Id.* at ¶ 25.) Dr. Lank noted that Plaintiff had enlarged tonsils that were touching his uvula. (*Id.*) She also noted that Plaintiff had a history of sleep apnea and that he claimed that a lack of a humidifier was contributing to his sleep apnea. (*Id.*)

On or about September 24, 2018, Wexford's Utilization Management Department received another request to obtain a humidifier for Plaintiff's C-PAP machine. (*Id.*)

On or about September 28, 2018, Dr. Garcia reviewed the renewed request and determined that a humidifier was not medically necessary for Plaintiff's C-PAP machine.[5] (*Id.* at ¶ 26.)

On or about September 29, 2018, Dr. Zahtz participated in another collegial review with Dr. Garcia to discuss Plaintiff's referral for an ENT consult. (*Id.* at ¶ 27; *see also* Dkt. 160-2 at pg. 24.) Based on the additional information related to the referral request, Dr. Garcia approved the referral request. (*Id.*) It was noted that Plaintiff had swollen tonsils that were almost touching his uvula and that he had some discomfort while swallowing. (*Id.*) However, Plaintiff's tonsils were not impeding his ability to swallow. (*Id.*) Dr. Garcia noted that Plaintiff's ENT appointment was to occur at UIC instead of a "local ENT." (SOF at ¶ 27; *see also* Dkt. 160-2 at pg. 24.)

Dr. Garcia was not involved with Plaintiff's care following his collegial review with Dr. Zahtz on or about September 29, 2018.[6] (*Id.* at ¶ 28.)

On or about October 25, 2018, Plaintiff saw Dr. Nancy Lank for complaints about his ongoing sleep apnea. (*Id.* at ¶ 29.) At that time, Dr. Lank noted that Plaintiff was overweight and

---

[5]    Defendants indicate in their statement of facts that the renewed request "was inaccurately labeled as an appeal[.]" (SOF at ¶ 26.) The Court observes that the documentation cited to in support of this statement only shows "appeal" information, but nothing to indicate that it was "inaccurately labeled" as such.

[6]    Plaintiff, citing to his own declaration, purports to dispute this fact, stating that "both Dr. Ritz and Dr. Garcia participated in the Wexford's Collegial Department together for the Illinois regional . . . and denied C-PAP humidifier." (Dkt. 184 at ¶ 26.)

they discussed his diet.  (*Id.*)  Lank also prescribed a 6-month supply of nasal saline spray to be used every two hours.  (*Id.*)  Nasal saline spray is used for hydration in a patient's airways, including the nose and throat.  (*Id.*)

On or about February 5, 2019, Plaintiff saw Dr. Ari Rubenfeld at UIC's ENT clinic.  (*Id.* at ¶ 30.)  During this appointment, Dr. Rubenfeld diagnosed Plaintiff with hypertrophy of the inferior nasal turbinate,[7] hypertrophy of the tonsils, and OSA.  (*Id.*)  He also noted that Plaintiff has been diagnosed with OSA through a sleep study in October 2013 and was using nasal saline spray/mist.  (SOF at ¶ 30;  *see also* Dkt. 160-2 at pg. 35.)  Dr. Rubenfeld recommended that Plaintiff undergo a tonsillectomy, uvulopalatopharyngoplasty,[8] and submucous resection of his inferior turbinates.[9]  (SOF at ¶ 30.)  Dr. Rubenfeld advised Plaintiff that the surgery might not cure his sleep apnea and that he might need to continue using his C-PAP machine.  (*Id.*)  Dr. Rubenfeld also noted that Plaintiff specifically requested a humidifier for his C-PAP machine.  (*Id.*)

On or about February 5, 2019, Dr. Zahtz saw Plaintiff following his appointment at UIC's ENT clinic.  (*Id.* at ¶ 31.)  He noted Dr. Rubenfeld's findings and plan for the three surgical procedures, and his notes indicate that he planned to refer Plaintiff back to UIC for those procedures.  (*Id.*)  He also noted that a C-PAP humidifier was not available for Plaintiff due to security issues at the prison.  (*Id.*)  Dr. Zahtz's notes show that he submitted a referral request for the surgeries.  (*Id.*)

On or about February 20, 2019, Plaintiff was approved for a pre-operative appointment

---

[7]     Turbinates are tiny structures inside of the nose.  They cleanse, heat and humidify air as it passes through the nasal cavity and into the lungs.  *See* https://my.clevelandclinic.org/health/treatments/22805-turbinate-reduction (last visited February 26, 2025.)

[8]     Uvulopalatopharyngoplasty is a surgery that opens the airways by removing or reshaping tissue in the throat.  *See*  https://my.clevelandclinic.org/health/treatments/25059-uvulopalatopharyngoplasty-uppp (last visited February 26, 2025.)

[9]     During turbinate reduction surgery, the surgeon carefully shrinks the turbinate tissue.  *See* https://my.clevelandclinic.org/health/treatments/22805-turbinate-reduction (last visited February 26, 2025.)

with an anesthesiologist and for his three surgical procedures.  (*Id.*)

On or about March 8, 2019, Plaintiff underwent his throat surgeries at UIC.  (*Id.* at ¶ 33.)  The staff at UIC noted that it was "ok" for Plaintiff to use his CPAP machine, and if he experienced any dryness, to use nasal saline solution.[10]  (*Id.*)

On or about March 11, 2019, Dr. Zahtz saw Plaintiff for a medical writ follow-up after his surgeries at UIC.  (*Id.* at ¶ 34.)  Dr. Zahtz's notes show that Plaintiff reported that he was doing "ok" and stated that he was breathing better with his CPAP machine.[11]  (*Id.*)  Plaintiff reported that he had a sore throat after his surgeries, to which Dr. Zahtz instructed Plaintiff to take Tylenol and Guaifenesin.[12]  (*Id.*)  Dr. Zahtz's notes show that he planned to refer Plaintiff back to UIC's ENT clinic for a one-month follow-up after his surgery.  (*Id.*)

On or about March 26, 2019, Plaintiff received another prescription for his nasal saline spray, which was good through the end of October 2019.  (*Id.* at ¶ 35.)

On or about April 2, 2019, Dr. Zahtz saw Plaintiff for a medical writ follow-up after his recent ENT appointment.  (*Id.* at ¶ 36.)  He noted that Plaintiff had normal post-operative findings and the surgical sites were well-healed.  (*Id.*)  Dr. Zahtz noted that Plaintiff's ENT had recommended that Plaintiff undergo a sleep study.  (SOF at ¶ 36;  *see also* Dkt. 160-2 at pg. 45.)  He also noted that the ENT recommended a humidifier for Plaintiff's C-PAP machine, but explained to Plaintiff that it had always been considered non-essential and was previously not

---

[10]    The Court observes that Plaintiff states that he admits Defendants' statement of fact ¶ 33, but, at the same time, seems to dispute whether he was told by UIC staff that it was "ok" for him to use saline solution.  (*See* Dkt. 184 at ¶ 33.)

[11]    Plaintiff disputes this fact, maintaining that he told Dr. Zahtz he was in "a lot of pain after his surgeries and the CPAP air blowing on the affected areas is causing him pain."  (Dkt. 184 at ¶ 34.)  Plaintiff cites to his own declaration and several letters that are addressed to Drs. Zahtz, Garcia and Ritz.  (*See* Dkt. 185 at pgs. 117-119.)  These letters, which are dated March 10, 2018, state that Plaintiff is "currently in a lot of pain because the dry air from [his] C-PAP machine [was] blowing on affected areas[.]"  (*Id.*)

[12]    Guaifenesin treats coughs and chest congestion.  It works by thinning and loosening mucus, making it easier to clear from the head, throat, and lungs.  It belongs to a group of medications called expectorants.  *See* https://my.clevelandclinic.org/health/drugs/24710-guaifenesin-tablets (last visited February 26, 2025.)

approved. (SOF at ¶ 36.) Dr. Zahtz noted that Plaintiff did not need any further treatment with his ENT. (*Id.*)

On or about September 12, 2019, Plaintiff received another prescription for his nasal saline spray, which was good through the end of August 2020. (*Id.* at ¶ 37.)

On or about November 13, 2019, Dr. Zahtz saw Plaintiff for a follow-up appointment about his C-PAP machine. (*Id.* at ¶ 38.) At that time, Plaintiff reported waking up four times per night while using his C-PAP machine. (*Id.*) Dr. Zahtz discussed changing the timing of Plaintiff's medications, and planned to re-treat Plaintiff with Guaifenesin. (*Id.*)

On or about December 16, 2019, Plaintiff saw Dr. Carlos Fior and requested a humidifier for his C-PAP machine. (*Id.* at ¶ 39.) Dr. Fior noted that Plaintiff was obese and in no acute distress. (*Id.*) He assessed Plaintiff with sleep apnea, "chronic DJD," and his notes indicate he planned to submit a referral for a humidifier for Plaintiff's C-PAP machine. (SOF at ¶ 39; *see also* Dkt. 160-2 at pg. 48.)

On December 25, 2019, Dr. Stephen Ritz reviewed a request for Plaintiff to have a C-PAP humidifier. (*Id.* at ¶ 40.) At that time, Dr. Ritz noted a prior humidifier request had been submitted on March 12, 2018, at which time Dr. Garcia proposed an alternative treatment plan to monitor Plaintiff's condition onsite and "re-presented on 9/24/28." (*Id.*; *see also* Dkt. 160-2 at pg. 50.) Dr. Ritz's notes show that he denied the renewed request for a C-PAP humidifier. (SOF at ¶ 41.) In addition to Dr. Garcia's prior denials in 2018, noting the lack of medical necessity for a C-PAP humidifier, Dr. Ritz also noted Plaintiff's latest progress notes from Dixon, which requested the humidifier. (*Id.*) The progress notes indicated Plaintiff had chronic pain and degenerative joint disease, but neither of these conditions were related to the need for a C-PAP humidifier. (*Id.*) The progress notes also indicated that Plaintiff was obese and had a history of sleep apnea. (*Id.*) Dr.

Ritz determined that Plaintiff did not have a medical condition that necessitated a humidifier for a C-PAP machine. (*Id.*) Instead, Dr. Ritz planned for an alternative treatment plan, which involved using nasal saline spray, increasing Plaintiff's hydration, and monitoring his condition on site. (*Id.*)

On or about April 24, 2020, Plaintiff's nasal saline spray was renewed through January 31, 2021. (*Id.* at ¶ 42.) On or about January 25, 2021, Plaintiff's nasal saline spray was renewed through September 30, 2021. (*Id.*)

On or about March 18, 2021, Dr. Zahtz saw Plaintiff at a medical writ follow-up. (*Id.* at ¶ 43.) At that time, Plaintiff weighed over 300 lbs. (*Id.*) Dr. Zahtz reviewed the settings of Plaintiff's C-PAP machine and noted he continued to have issues with his sleep apnea and planned to obtain a follow-up with an ENT to discuss his C-PAP treatment. (*Id.*) Dr. Zahtz planned to submit an ENT referral for Plaintiff and noted he may need a follow-up sleep study. (*Id.*)

On or about June 10, 2021, NP Susan Tuell saw Plaintiff upon his request for a C-PAP humidifier. (*Id.* at ¶ 44.) At that time, NP Tuell noted that Plaintiff reported poor sleep, "sore nares [*sic*]," and dry throat at night from using his C-PAP machine. (*Id.*) NP Tuell's notes indicate that she planned to submit a referral request for a C-PAP humidifier for Plaintiff. (*Id.*)

On or about June 16, 2021, Dr. Ritz reviewed and approved the request for Plaintiff's humidifier for his C-PAP machine. (*Id.* at ¶ 45.) At that time, Dr. Ritz noted that Plaintiff continued to report a restless sleep pattern. (*Id.*) He also reported on-going nasal and throat irritation from his C-PAP machine without humidification. (*Id.*) Dr. Ritz also noted that Plaintiff had a tonsillectomy and turbinate surgery in 2019. (*Id.*) During a follow-up appointment, Plaintiff's ENT suggested a humidifier for Plaintiff's C-PAP machine for optimal respirations and function. (*Id.*) Dr. Ritz also noted that Plaintiff had developed hypertension and elevated CPK

15

levels with unknown etiology. (*Id.*) Plaintiff's progress notes also show he contracted Covid-19 in 2020 and had ongoing shortness of breath. (*Id.*) Dr. Ritz also noted that Plaintiff had already been approved for a follow-up appointment with ENT. (*Id.*)

Plaintiff testified that he received a humidifier for his CPAP machine in 2021. (*Id.* at ¶ 46.) He also underwent a second sleep study sometime around February 2022. (*Id.*)

### *Medical Opinions*

Defendants Zahtz, Garcia, and Ritz have submitted Declarations representing that the standard of care for sleep apnea involves a variety of practices and may include providing a C-PAP machine. (*Id.* at ¶ 48.) They represent that some patients may use a humidifier with their C-PAP machines. (*Id.*) However, a humidifier is not medically necessary for the machine to function. (*Id.*) They represent that a humidifier for a C-PAP machine is a comfort measure to keep a patient's airways hydrated. (*Id.*) They represent that the lack of a humidifier for a C-PAP machine does not put a patient's life at risk of serious harm, and Plaintiff's complaints of dry nose and throat did not pose a risk of harm to his health. (*Id.*) They represent that sleep apnea can be treated with weight loss, antihistamines, nasal saline spray, mouth guards, oral devices to move the jaw forward, a C-PAP machine, and or surgery. (*Id.*) They represent that for most of Plaintiff's treatment, his condition did not necessitate the use of a C-PAP humidifier. (*Id.*) Defendants also represent that Plaintiff was provided nasal saline spray to help maintain adequate hydration in his airways. (*Id.*)

The Declaration of Dr. Zahtz represents that he had conversations with the prison administration, including the Health Care Unit Administrator, about whether the prison would permit Plaintiff to have a humidifier for his C-PAP machine. (*Id.* at ¶ 51.) Dr. Zahtz represents that, during these conversations, Dr. Zahtz was told that unless it was medically necessary, the

humidifier presented a major security risk to the prison and would not be permitted. (*Id.*)

Drs. Zahtz, Garcia and Ritz represent that, based on their review of Plaintiff's medical records, they did not see any evidence that Plaintiff was harmed by the lack of a C-PAP humidifier while at Dixon or harmed by the timing of his appointments at UIC's ENT clinic. (*Id.* at ¶ 52.) They represent that a recommendation from an off-site physician is not equivalent to a medical order or prescription and a recommended course of care is not guaranteed to be medically necessary. (*Id.* at ¶ 53.) They represent that if recommendations are not medically necessary, the recommendations may be denied on that basis or due to security concerns at a prison. (*Id.*)

Drs. Zahtz, Garcia and Ritz represent that, based on their review of Plaintiff's medical records, they did not believe that a C-PAP humidifier was medically necessary for Plaintiff, regardless of Dr. Rubenfeld's recommendation on February 5, 2019. (*Id.* at ¶ 54.) They represent that nasal saline solution was an appropriate alternative to a humidifier. (*Id.*) They also represent that to the extent Plaintiff required off-site services, including surgical intervention, Plaintiff received timely and appropriate off-site care. (*Id.* at ¶ 55.) They represent that Dr. Rubenfeld recommended that Plaintiff undergo a tonsillectomy, uvulopalatopharyngoplasty, and submucous resection of his inferior turbinates, and that he did not suggest that these surgeries needed to happen on an emergent or urgent basis. (*Id.*) They represent that, as such, they could be completed on an elective basis, meaning they could be completed based on Dr. Rubenfeld's availability. (*Id.*)

Defendants represent that Plaintiff was also an established patient at UIC's ENT clinic, and they were familiar with his medical history, making a referral back to that clinic appropriate. (*Id.* at ¶ 56.) They represent that under the Wexford-IDOC contract, the IDOC requires that Wexford refer patients from Dixon to the UIC hospital and its clinics for routine appointments and treatment. (*Id.* at ¶ 57.) They represent that if an off-site service or appointment needs to be completed on an

urgent basis, Wexford staff may arrange to send a patient to a local clinic for treatment, subject to that clinic's availability. (*Id.*) They represent that if a patient has a medical emergency, the patient is sent off-site to a local hospital without prior authorization from Wexford. (*Id.*) They represent that the cost of Plaintiff's medical treatment, including a humidifier for his C-PAP machine, and his treatment with an ENT at UIC or elsewhere, was not a factor in determining whether to approve requests for the same. (*Id.* at ¶ 58.)

They also represent that Plaintiff likely would not have needed a C-PAP machine at all if he lost weight, as recommended by his providers. (*Id.* at ¶ 59.) They also represent that Plaintiff's medical records show he weighed approximately 300 lbs, which, in his case, constituted morbid obesity. (*Id.*) They represent that patients who are morbidly obese may develop obstructive sleep apnea due to their habit of putting additional pressure on their airways while sleeping. (*Id.*) They represent that patients with obstructive sleep apnea who are morbidly obese can alleviate or completely resolve those issues by losing weight. (*Id.*)

Dr. Zahtz represents that he did not receive, read, or review any letters, phone calls, or other correspondence prepared and submitted by Plaintiff to him. (*Id.* at ¶ 60.) Dr. Garcia represents that he did not personally interact with Plaintiff at Dixon, nor did he ever receive, read, or review and letters, phone calls, or other correspondence prepared and submitted by Plaintiff. (*Id.* at ¶ 61.) Dr. Ritz represents that he did not personally interact with Plaintiff at Dixon, nor did he ever receive, read, or review any letters, phone calls, or other correspondence prepared and submitted by Plaintiff.[13] (*Id.* at ¶ 62.)

---

[13] In his summary judgment materials, Plaintiff includes a February 2023 deposition transcript of Dr. Ari Rubenfeld. (Dkt. 185 at Exhibit B, pgs. 31-54.) To the extent Dr. Rubenfeld's testimony is relevant to the issues/claims presented at summary judgment, the Court addresses it in the "Discussion" section of this order.

### III.    Summary Judgment Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law.  *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).  If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

### IV.    Discussion

In this suit, Plaintiff alleges that Defendants Garcia and Ritz were deliberately indifferent to his serious medical needs.  He complains that Defendants failed to adequately respond to his requests for a humidifier for his C-PAP machine.  He also complains that Defendants delayed sending him to an ENT specialist and that they denied sending him to an ENT of his choosing.

19

Defendants Garcia and Ritz argue they are entitled to summary judgment on Plaintiff's Eighth Amendment medical claim because "[n]o reasonable jury could conclude that [they] acted with deliberate indifference in their review of various requests for a humidifier for Plaintiff's CPAP machine, or review of requests for off-site treatment." (Dkt. 161 at pg. 4.) The Court agrees with Defendants, and finds that they are entitled to summary judgment on Plaintiff's Eighth Amendment medical deliberate claim.

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. To prove a claim of deliberate indifference, the plaintiff must "establish that [he] suffered from 'an objectively serious medical condition' and that the 'defendant was subjectively deliberately indifferent to that condition.' " *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)).

Initially, Defendants assert that Plaintiff has failed to establish the existence of an objectively serious medical need. In support of this argument, they point to Plaintiff's complaints of a "dry throat and feeling tired in the morning because he would occasionally wake up at night." (*See* Dkt. 161 at pg. 5.)

What constitutes a sufficiently "serious medical need" is "far from self-defining[,]" *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997), and the Court agrees that Plaintiff's

particular complaints of a "dry throat" and/or a feeling of tiredness (from occasionally waking up at night) do not suggest an objectively serious medical condition. However, Defendants' argument ignores Plaintiff's diagnosis and treatment for OSA and the various related symptoms he experienced over the timeframe relevant to the complaint. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."); *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (objectively serious conditions include "chronic or degenerative conditions . . . that may escalate and have significant future repercussions unless adequately treated"); *see also Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (a medical need is "serious" if has been diagnosed by a physician as mandating treatment or it so obvious that even a lay person would recognize the necessity of medical treatment). Thus, the Court finds that Plaintiff's OSA (and his related symptoms) is sufficient to establish a serious medical condition. However, Plaintiff's claim fails on the deliberate indifference prong.

As discussed above, the only federal claim that remains at summary judgment is against Drs. Garcia and Ritz, based on the limited role they played in reviewing/handling Plaintiff's various requests for a C-PAP humidifier and his treatment with an ENT specialist. Based on the evidence before this Court, no reasonable jury could conclude that Drs. Garcia and Ritz acted in a reckless manner in reviewing/handling Plaintiff's requests for a C-PAP humidifier and/or an ENT consultation. To the contrary, the evidence shows that Drs. Garcia and Ritz utilized their clinical judgment in reviewing the various requests, and responded reasonably based on the evolving picture of Plaintiff's overall health condition.

To be sure, the evidence concerning Dr. Garcia shows that, in March 2018, he was involved

in a collegial review with Dr. Zahtz regarding a referral request to obtain a humidifier for Plaintiff's C-PAP machine. (SOF ¶ 20.) During a collegial review, a utilization management physician will review the referral request and any relevant medical records and confer with the prison's medical director. (*Id.* at ¶¶ 3, 12-13.) If Dr. Garcia did not believe that the referral was medically necessary, he would work with the Medical Director to formulate an alternative treatment plan. (*Id.*) At the time of that particular collegial review, Dr. Garcia concluded that a humidifier was not medically necessary for Plaintiff's C-PAP machine, and instructed Dr. Zahtz to continue to monitor Plaintiff's condition for any changes that might warrant a humidifier. (*Id.* at ¶ 20.)

About a month later,[14] Dr. Garcia participated in another collegial review with Dr. Zahtz regarding a request to send Plaintiff to an ENT specialist. (*Id.* at ¶ 22.) At that time, Dr. Garcia did not have enough information to approve the request and therefore requested additional information from the prison. (*Id.*)

About five months later, on September 24, 2018, Dr. Garcia participated in a third collegial review with Dr. Zahtz regarding another referral request to obtain a humidifier for Plaintiff's C-PAP machine. (*Id.* at ¶ 26.) This particular referral request had been submitted by Dr. Lank, who noted that Plaintiff reported having a dry throat and waking up at night while wearing his C-PAP machine. (*Id.* at ¶ 24.) Dr. Garcia reviewed the request, conferred with Dr. Zahtz, and determined that a C-PAP humidifier was still not medically necessary. (*Id.* at ¶ 26.) Instead, Dr. Garcia recommended that Plaintiff use a saline solution to keep his airways hydrated at that time.[15] (*Id.* at ¶ 40.)

---

[14] As discussed at footnote 4 above, it is not entirely clear the exact date this collegial review occurred, but, based on the other evidence in the record, it appears to have occurred at some point in early April 2018.
[15] The Court notes that throughout his summary judgment materials, Plaintiff generally maintains that saline solution does not "work" for him and that Defendants "continued to provide [him] with saline nasal spray[.]" (*See e.g.,* Dkt. 185 at pgs. 2, 10, 15-16.) The Court observes that while Plaintiff makes these assertions now, his medical records do not reflect that he complained to any medical professional about any specific problems with saline solution.

Five days later, on September 29, 2018, Dr. Garcia participated in another collegial review regarding a renewed request to refer Plaintiff to an ENT. (*Id.* at ¶ 27.) Dr. Garcia approved the request based on additional information provided by Dr. Lank (specifically, that Plaintiff had swollen tonsils and discomfort while swallowing). (*Id.*) At that point, Dr. Garcia concluded it was appropriate to refer Plaintiff to UIC for treatment (where Plaintiff had received care in the past). (*Id.* at ¶¶ 27, 55-57.)

Similarly, the evidence related to Dr. Ritz shows that, on December 25, 2019 (several months *after* Plaintiff's surgeries and *after* Plaintiff's consultation with an ENT at UIC), he participated in a collegial review with Dr. Zahtz to discuss a recent (post-surgery) referral for a C-PAP humidifier for Plaintiff. (*Id.* at ¶ 40.) Dr. Ritz reviewed the referral request and discussed the referral with Dr. Zahtz. (*Id.* at ¶¶ 4, 12-13.) Dr. Ritz noted that Dr. Garcia had previously declined to approve Plaintiff for a C-PAP humidifier in March 2018, as it was not medically necessary at that time and noted that Dr. Garcia had instead recommended that Plaintiff use nasal saline solution. (*Id.* at ¶ 40.) After reviewing the referral and Plaintiff's recent progress notes, and after conferring with Dr. Zahtz, Dr. Ritz determined that a humidifier for Plaintiff's C-PAP machine was not medically necessary. (*Id.* at ¶ 41.) Instead, per the prior recommendations of Dr. Garcia and Plaintiff's ENT providers at UIC, Dr. Ritz recommended that Plaintiff continue using nasal saline solution and increase his hydration. (*Id.*)

Several months later, in June 2021, Plaintiff met with NP Tuell based on his request for a humidifier for his C-PAP machine. (*Id.* at ¶ 44.) Following that visit, Nurse Tuell submitted a referral request to obtain one for Plaintiff. (*Id.*)

On June 16, 2021, Dr. Ritz held a collegial review regarding NP Tuell's referral request for a humidifier for Plaintiff's C-PAP machine. (*Id.* at ¶ 45.) Dr. Ritz noted that Plaintiff continued

to report on-going sleeplessness and nasal and throat irritation.  (*Id.*)  He also noted that Plaintiff had recovered from his tonsil surgery, and that at a follow-up appointment Plaintiff's ENT provider suggested a humidifier to ensure optimal respiration and function.  (*Id.*)  Dr. Ritz also noted that Plaintiff's condition had changed significantly since the prior referral request, including the development of hypertension, elevated CPK levels of unknown etiology, and that Plaintiff had contracted COVID-19 in 2020 and developed on-going shortness of breath.  (*Id.*)  At that point, Dr. Ritz indicated that Plaintiff's condition had changed to the point he agreed with the recommendation for a C-PAP humidifier.  (*Id.*)  Plaintiff testified that he received the humidifier at some point in 2021.  (*Id.*)

There is nothing in the sequence of events described above that suggests that the medical decisions made by Drs. Garcia and/or Ritz were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances").

It may be that Plaintiff did not receive the particular care he wanted, when he wanted it,[16] or where he wanted it, but inmates are not entitled to "unqualified access to healthcare," *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), or the best care possible, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). And, neither medical malpractice, nor negligence, nor even gross negligence rise to the requisite culpable state of mind for deliberate indifference, which

---

[16]    The Court notes that "'[a] delay in the provision of medical treatment for painful conditions . . . can support a deliberate indifference claim.'"  *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).  But to prevail on such a claim, a plaintiff must "introduce[] verifying medical evidence that shows his condition worsened because of the delay."  *Knight*, 590 F.3d at 466; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (a plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm").  Plaintiff submits no such evidence here.

is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Thus, a prison medical provider is not deliberately indifferent simply because he offers a different course of treatment than the one requested by the inmate. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Despite the evidence in the record, Plaintiff adamantly maintains in his "opposition" brief that "Dr. Garcia's clinical judgment was wrong and unacceptable," that he persisted in a course of treatment that he knew to be ineffective, and that he "intentionally wanted to delay [Plaintiff's] ENT specialist visit because he may have been upset because he was overruled." (Dkt. 185 at pgs. 2-10.) Plaintiff makes similar assertions with respect to Dr. Ritz; he claims that Dr. Ritz did not exercise appropriate judgment, persisted in a course of treatment that was ineffective, and ignored Plaintiff's "pleas for help." (*Id.* at pgs. 13-16.) However, Plaintiff's personal beliefs and his bald speculation are not enough to defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat a summary judgment motion."); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (summary judgment is the 'put up or shut up' moment in a lawsuit.").

Likewise, Plaintiff's reliance on the February 10, 2023, deposition testimony of Dr. Ari B. Rubenfeld, MD, which is appended to his "opposition" brief at Exhibit 2, pgs. 31-54,[17] is not

---

[17] Plaintiff asserts in his "opposition" brief that Dr. Rubenfeld "testified that a CPAP humidifier is medically necessity [*sic*][,]" and that Dr. Rubenfeld "states all CPAP should be humidified." (Dkt. 185 at pgs. 8, 16.) The particular portions of Dr. Rubenfeld's testimony that Plaintiff seems to be referring to are reproduced below:

Q: Okay. And that sort of actually kind of leads into a question I was going to ask. You used the phrase there's an optional saline hookup. Will the CPAP machine function without this optional humidification component?

A: So at great risk of speaking in – you know, before myself as I should, I don't dispense these machines but I believe that they function as CPAP machines, i.e., delivering pressure of the air regardless of whether humidification is provided or not.

So the actual intent of a CPAP machine is to provide continuous pressure, this wind tunnel thing, to afford the airway to stay open. So the answer to that, in short, is yes.

Q:      Okay. Would you say that the saline hookup, the humidification hookup is meant to serve as a comfort measure or is a preferential matter?

A:      Well, so, I mean the answer is on the surface yes. That's the low hanging fruit to say yes. We struggle with getting patients to be compliant with CPAP machines and it's like trying to give a patient a medication they have to take six times a day. Whose problem is it when there's noncompliance in our experiences. So the idea is to try to match comfort with need.

So someone designing the CPAP machines at some point recognized that having a profound drying effect on patients means that a machine is effectively useless, i.e., there's a high degree of noncompliance. The patients are uncomfortable, they're not going to keep using it because they're not thinking through all of that. And I can understand that. So in many ways it's about comfort.

However, a dry oral nasal cavity does not function as it should. As I stated before if you go out in the freezing cold on a cold Chicago day and it's super dry as winter often times is your nose is generally going to shut down in an effort to preserve humidity. It just naturally has a tendency towards that.

So a CPAP machine without humidity does run the risk of being less maximally effective as a CPAP machine without.

Q:      Okay. In that maximal efficacy or maximal efficiency as you characterize there, does that have to do with the patient's compliance or lack thereof with the machine if it's not humidified?

A:      No. Dry air in the nasal cavity is ineffective air in the nasal cavity. We see this constantly in the hospital when we put nasal cannulas on patients who are breathing through their nose and they immediately develop crust in their nose or nose bleeding or inability to effectively have that oxygen delivered to them. So I think there's a function component to it, though.

(Dkt. 185 at Exhibit 2, 25:18-25; 26-27; 28:1-14.)

Q:      And when you had stated that the humidified CPAP machine is a comfort measure but also a need because dry air is ineffective air, is that based on the threshold that you just kind of described where you would objectively see that they had a dry mucus membrane?

A:      No.

Q:      Make sense?

A:      It does make sense. Anytime you have something delivering air to you, whether it's just pure oxygen or forced air through a medical device like a CPAP machine, it really for maximal efficacy should be humidified.

We all this for anybody who lives in a house that has forced air that we have humidifiers associated with forced air furnaces. It's the same idea.

Q:      Okay. So just so I understand, the humidified CPAP would also be a need when the patient is just telling you that they feel dry and even though you don't objectively see that they have dry mucus membranes, right?

sufficient to defeat summary judgment.

Initially, Dr. Rubenfeld's deposition was taken years after Plaintiff's treatment with Defendants Garcia and Ritz, and the specific testimony that Plaintiff seems to draw the Court's attention to was not made in the context of Plaintiff's particular treatment (nor does it speak to whether a humidifier was medically necessary for Plaintiff at the time of his treatment).

In any event, a disagreement over whether one course of treatment is preferable to another is not enough to show deliberate indifference, *see Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996), and there is simply nothing in the record before this Court that suggests that Defendants' medical decisions, as they concern the C-PAP humidifier and referral to an ENT specialist, were a substantial departure from accepted professional standards or not based on medical judgment. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (affirming summary judgment in favor of prison doctor when the prisoner failed to identify evidence showing that the challenged treatment decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment"); *see also Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (rejecting prisoner's argument that prison doctor's choice of pain medication demonstrated deliberate indifference because the prisoner's own doctor recommended a different medication when no evidence suggested that the prison doctor's decision was a substantial departure from accepted professional standards or was not based on a medical judgment).

---

A:      Counselor, in my – from my perspective, I can't think, unless there is a mold problem, that there should be a single instance when a patient has a CPAP machine that does not have humidification associated with it.

Q:      Okay.

A:      Clinically speaking.

(Dkt. 185 at Exhibit 2, 65:7-25; 66:1-10.)

Accordingly, Defendants Garcia and Ritz are entitled to summary judgment on Plaintiff's Eighth Amendment medical deliberate indifference claim. The Court relinquishes its supplemental jurisdiction, 28 U.S.C. § 1367(a), over Plaintiff's state law negligence claim and dismisses that claim for want of subject matter jurisdiction. The Court offers no opinion as to whether Plaintiff should refile in state court or the merits of any potential claim he may have.

## V.    Conclusion

Defendants' motion for summary judgment (Dkt. 159) is granted. Final judgment shall enter. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Date:  March 6, 2025          By:    _____
Iain D. Johnston
United States District Judge